## Case No. 12,852.
### SILLIMAN v. HUDSON RIVER BRIDGE CO.
### COLEMAN v. SAME.
[4 Blatchf. 395.] 1

Circuit Court, N. D. New York. Oct., 1859.

BRIDGES — OBSTRUCTIONS TO NAVIGATION —COMMERCE AMONG THE STATES—CONFLICTING INTERESTS—STATE LEGISLATION—INJUNCTION.

1. The granting of injunctions by the courts of the United States, considered. Per Hall, J.

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

2. Injunctions, in cases of public nuisance or purpresture, are only to be granted in order to prevent irreparable mischief, or. to prevent or suppress continual, oppressive, or vexatious litigation. Per Hall, J.

3. The right of the plaintiff, and the serious character of the injury, ought to be clearly established by a trial at law, or otherwise, before a court of the United States should grant an injunction to restrain the construction of a bridge authorized by an act of the legislature of the state in which it is proposed to be erected. Per Hall, J.

4. The question, whether the bridge proposed to be constructed in this case, one over the Hudson river at Albany, would materially obstruct navigation, discussed. Per Hall, J.

5. In the present case, the extent of the threatened injury, and of the public benefit to be secured by the erection of a bridge, may be proper subjects of inquiry, and a remedy by injunction should not be afforded unless the impending injury is irreparable, and the right of the plaintiff free from serious doubt. Per Hall, J.

[Cited in Blanchard v. Western Union Tel. Co., 60 N. Y. 514.]

6. The mere grant of power by the constitution to congress, to regulate commerce among the several states. is not, per se. and without any exercise of the power by congress, an absolute inhibition of all state legislation which may interfere with or affect the inter-state commerce of the United States. Per Hall, J.

7. The states retain the power to legislate in regard to turnpike roads, railroads, bridges, ferries. and the public health, and generally in regard to the internal commerce and police of the state. Per Hall, J.

8. The construction of the bridge in this case, it being authorized by an act of the legislature of New York, cannot be restrained by this court, by injunction, unless the provisions of the act are repugnant to the constitution or laws of the United States, or, unless the bridge, if erected. would practically conflict with and abridge the rights to which the plaintiff is entitled under the laws of the United States. Per Hall, J.

[Cited in Miller v. New York. Case No. 9,585; Ormerod v. New York, W. S. & B. R. Co.. 13 Fed. 372.]

9. The extent of the plaintiff's rights, as the holder of a coasting license. granted under the act of February 18th. 1793 (1 Stat. 306, § 4), discussed. Per Hall, J.

10. The cases of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, Wilson v. Blackbird Creek Marsh Co., 2 Pet. [27 U. S.] 245, and Pennsylvania v. Wheeling & Belmont Bridge Co., 13 How. [54 U. S.] 518, and 18 How. [59 U. S.] 421, considered. Per Hall, J.

11. The power of deciding between the conflicting interests of river navigation and of transportation across navigable rivers by permanent structures, is a legislative and not a judicial power. Per Hall, J.

12. The legislature of a state may, in the absence of any restraint by congressional legislation, authorize the erection of a bridge over its navigable waters. Per Hall, J.

13. Congress can prohibit the erection of the bridge in this case, or prescribe what facilities it shall afford for the navigation of the river; but, in the absence of congressional legislation, the law of the state must govern, and, unless the legislation of the state conflicts with that of congress, or with the constitution of the United States, this court has no authority to annul the legislation of the state by the restraining process of injunction. Per Hall, J. See the opinion of

Nelson, J., in Silliman v. Hudson River Bridge Co. [Case No. 12,851].

[Cited in Miller v. New York, Case No. 9,-585.]

[These were bills in equity by Robert D. Silliman and Frederick W. Coleman against the Hudson River Bridge Company.]

These are the same cases reported [in Case No. 12,851], in which a provisional injunction was there granted. They came up in September, 1858, on final hearing, on pleadings and proofs.

Reverdy Johnson and William A. Beach, for plaintiffs.

William H. Seward, Nicholas Hill, John H. Reynolds, and John V. L. Pruyn, for defendants.

[Before NELSON and HALL, District Judges.]

NELSON, District Judge, delivered no written opinion, but was in favor of a decree for the plaintiffs, on the grounds set forth in his opinion, Silliman v. Hudson River Bridge Co. [Case No. 12,851], on granting the motion for a provisional injunction.

HALL, District Judge. The plaintiff Silliman is a resident of the city of Troy, and a citizen of the United States. He prosecutes his suit as part owner of seven barges, which, at the time of the filing of his bill, were, and, for several years prior thereto, had been, duly enrolled and licensed for the coasting trade, under the acts of congress in such case made and provided, and which were then actually employed in the navigation of the Hudson river and other navigable waters of the United States.

The plaintiff Coleman is a resident of the state of Massachusetts, and a citizen of the United States. He prosecutes his suit as part owner and master of the schooner Vintage, a vessel enrolled and licensed for the coasting trade, under the laws of the United States, and which, prior to the commencement of his suit, had been regularly employed in carrying on the coasting trade between Barnstable in Massachusetts, and the ports of Albany and Troy, and between the last-mentioned ports and other ports and places in various states of the Union.

The defendants having indicated their purpose to construct a bridge over the navigable waters of the Hudson river, at Albany, in pursuance of their act of incorporation, these bills were filed by the respective plaintiffs therein; and they severally pray that the act of the legislature of New York, authorizing the construction of a bridge across the Hudson river, may be decreed to be unconstitutional and void; that the defendants may be restrained from erecting the proposed bridge, and from erecting any bridge over the tide waters of the river, or below the city of Troy, by which any permanent structure shall be placed in the river or over the same, unless elevated above the ordinary height, at all stages of the water, of all masts and chimneys of the various craft navigating the river; and that the plaintiffs may be protected in the enjoyment of the free navigation of the river, and may have such other and further relief as may seem meet and agreeable to equity.

The plaintiffs severally rely upon their coasting licenses, as the foundation of their alleged rights, and they consequently claim that such rights are secured to them by and under a law of the United States. They assume that the rights secured to them by such licenses are about to be violated by the defendants, and they, therefore, ask this court to interpose by injunction, to prevent the injury which, it is insisted, this threatened violation will produce.

It is not denied, that, in a proper case, this court may interfere, by injunction, for the protection of rights secured to our citizens by the constitution and laws of the United States. The courts of the United States are expressly authorized by an act of congress to issue this writ. It must, however, be issued or refused in accordance with the legislation of congress and the settled rules of practice of courts of equity in such cases. By the law of the United States, (Act Sept. 24, 1789, § 16; 1 Stat. 82,) it is provided, "that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law;" and, by the settled practice of courts of equity, injunctions in cases of public nuisance or purpresture, are only to be granted in order to prevent irreparable mischief, or to prevent or suppress continual, oppressive or vexatious litigation. The right of the plaintiff and the serious character of the injury, ought to be clearly established by a trial at law, or otherwise, before a court of the United States should grant an injunction to restrain the construction of a bridge authorized by an act of the legislature of the state in which it is proposed to be erected. The English court of chancery does not ordinarily issue a permanent injunction to restrain acts alleged to amount to a nuisance, until a court of law has decided that they constitute a nuisance. White v. Cohen, 19 Eng. Law & Eq. 146, 149; Earl of Ripon v. Hobart, 1 Coop. t. Eld. 333; Id., 3 Mylne & K. 169. And this is substantially the rule in our own courts. Mohawk Bridge Co. v. Utica & S. R. Co., 6 Paige, 554; 2 Story, Eq. Jur. §§ 924, 924a; Hart v. Mayor of Albany, 3 Paige, 213.

The act of congress, above referred to, which provides that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy can be had at law, and the further provision (Act March 2, 1793, § 5; 1 Stat. 334, 335) that writs of injunction shall not be granted in any case without reasonable previous notice to the adverse party or his attorney of the time and place of moving for the same, sufficiently indicate the spirit and policy of the legislation

of congress on the subject of suits in equity and of injunctions. To encourage either, in preference to the ordinary common law remedies, has not been the policy or purpose of the national legislature, and, therefore, ought not to be the policy or purpose of the courts of the United States.

There may be cases in which, on the right of the plaintiff being established to the satisfaction of a court of equity, no previous trial at law should be required. But I confess that I am not entirely satisfied that this would be a proper case for an injunction, even if it were clearly established that the plaintiffs might, in an action at law, recover any damages sustained by them in consequence of injury or detention caused by the bridge authorized by the defendants' act of incorporation. I shall state some of the considerations which have influenced my judgment upon this branch of the case, before proceeding to consider the question of the plaintiffs' alleged right under the constitution and laws of the United States; on which, as the main and most important question in these cases, rather than upon any minor question, I prefer to rest my decision.

It is not asserted that the defendants, in the construction of the proposed bridge, are about to exceed or violate the provisions of their charter. Whether such a bridge as their charter assumes to authorize, would materially obstruct the navigation, was deemed an important question, and was argued at great length and with great zeal and ability. The question is not free from difficulty, and the evidence bearing upon it is exceedingly conflicting and contradictory. The defendants' act of incorporation requires the bridge thereby authorized to be constructed at an elevation of at least twenty feet above common tide water, so as to allow under it the free passage of canal boats and barges without masts, with draws, or a draw, of sufficient width to admit the free passage of the largest vessels navigating the Hudson, and in such manner as to cause no substantial impediment or obstruction to the free navigation of the river. The defendants are also required to keep in readiness one or more steam boats or steam tugs, suitable for towing vessels through the draw; to tow all sail vessels through said draw, whenever required so to do by the officers of such sail vessels, on their regular passage up and down the river, without charge; to afford all such other facilities as may, in the judgment of the canal board, be requisite in passing through the said draw without hindrance or delay; and to remove bars and obstructions which may be formed in the river by reason of the bridge or the piers thereof. And these, with the other provisions made for the freedom and security of the navigation, it must be presumed are all that the legislature deemed necessary for that purpose. It is clear, from the provision of the charter allowing treble damages to any party aggrieved by any unnecessary delay or refusal to open the draw, and other provisions of the charter to which it is not necessary to refer in detail, that the legislature supposed it to be necessary, or at least expedient, to provide a remedy to parties who should be injured by the defendants' neglect, or by their non-compliance with the terms of the act; and, upon these provisions, it has been argued, with much earnestness and force, that the act of incorporation, notwithstanding the provision that the bridge shall be so constructed as to cause no substantial impediment or obstruction to the free navigation of the river, bears upon its face a substantial admission that cases may occur in which vessels will be impeded, obstructed, or injured by reason of the erection of the bridge, or the negligence of the officers or agents of the defendants. Upon the question of the extent to which the bridge would obstruct navigation, many witnesses have been examined by the respective parties; on the one side, for the purpose of showing that the bridge proposed to be erected will be, and, on the other side, for the purpose of showing that it will not be, "a material obstruction to navigation." The meaning of these words, when used by counsel and judges in the discussion of cases of this character, or by witnesses in their testimony, is not capable of any precise and definite determination. Different witnesses attach different meanings to them, and, if it be held that the obstruction complained of must be a material obstruction to navigation, in order to justify the interposition of this court, it will be nearly impossible to fix any definite and satisfactory meaning to these terms. Nor is it yet authoritatively and conclusively settled, that the rights of the parties, in cases of this kind, do not depend upon the magnitude and comparative importance of the conflicting interests involved in each particular case—upon the importance of the navigation of the river as compared with the importance of the trade and travel to be accommodated by the bridge. In a suit at law brought to recover damages occasioned by an unlawful obstruction to the exercise of conceded rights of navigation conferred by a coasting license, it would probably be sufficient to show that the obstruction and damage were appreciable, however slight. This would entitle the plaintiff to recover his actual damages, as his strict legal right. But, on an application for an injunction, which is ordinarily addressed to the sound judicial discretion of the court, I incline to the opinion, that, in a case like this, the extent of the threatened injury, and of the public benefit to be secured by the erection of a bridge, may be proper subjects of inquiry, and that this extraordinary remedy by injunction should not be afforded unless the impending injury may well be denominated irreparable, and the right of the claimant properly regarded as free from serious doubt.

The evidence in this case justifies the conclusion, that the proposed bridge, if built, will

sometimes, and perhaps not very unfrequently, produce slight delays, and, possibly, at times, no inconsiderable injury to boats and vessels navigating the river across the line of the bridge. But the act of incorporation which authorizes the construction of the bridge, contains such provisions as the legislature thought necessary and expedient in order to protect the interests of commerce, and to prevent any material obstruction to navigation, as well as to secure full and perfect remedies to all persons who should be injured by the wrongful acts of the defendants. It is, therefore, not certain that any injury will ever accrue to these plaintiffs, even if the defendants shall erect and maintain the bridge provided for in their act of incorporation; and there is nothing in the bills of complaint to show that the plaintiffs, in case the bridge should be built and they should continue, under renewed licenses, to employ their vessels in the coasting trade, and should suffer injury, detention and damage in consequence of the erection of the bridge, would not have a full and adequate remedy at law.

A particular vessel like the Vintage might pass the bridge for years, without detention, delay or injury; although it might possibly be delayed and injured upon the first attempt to pass. All is uncertain, yet the probabilities of loss may possibly be sufficient to authorize the injunction, if the plaintiffs' right is clear, as the granting of the injunction, if the bridge cannot lawfully be erected and maintained, must be an advantage rather than an injury to the defendants. I confess, however, that I entertain serious doubts upon the question of issuing the injunction, independent of the constitutional questions which were raised upon the argument. But important constitutional questions have been pressed upon our attention, questions which will ultimately demand the serious consideration of the court of dernier resort, whatever may be the final determination of this court.

I shall not attempt the discussion of the question whether the constitutional provision that congress shall have power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes," is, per se, and without any exercise of the power by congress, an absolute inhibition of all state legislation which may interfere with or affect the foreign and inter-state commerce of the United States. I deem the discussion of that question unnecessary, because I consider it settled, by paramount authority, that the mere grant of power cannot have this effect; and because congress, by the passage of the act under which the plaintiffs have received licenses, and other laws, has actually exercised the power to regulate commerce with foreign nations and among the states. I deem it abundantly established, by numerous decisions of the supreme court of the United States, that the states have an undoubted right to pass many laws, which may have, incidentally, not only a remote, but an immediate and very considerable influence upon commerce among the states. In the leading case of Gibbons v. Ogden [9 Wheat. (22 U. S.) 1], it was very clearly intimated by Mr. Chief Justice Marshall, in delivering the opinion of the court, that such laws formed "a portion of that immense mass of legislation which embraces everything within the territory of a state, not surrendered to the general government; all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws, of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass."

The power to regulate commerce is not the source from which the right of a state to pass such laws is derived. Even if it should be conceded that the mere constitutional grant of power to congress "to regulate commerce," &c., necessarily, and at once, without the exercise of the power by that body, destroyed and annihilated all regulations of commerce previously existing under state authority, and forever inhibited the states from the making of any future regulations which affect only the instruments and operations of commerce, and could flow from no other source of power than that to regulate commerce with foreign nations and among the states, it is entirely clear that the states still retain the power to legislate in regard to turnpike roads, railroads, bridges, ferries, and the public health, and generally in regard to the internal commerce and police of the state; and that all laws made in the fair and legitimate exercise of this power, are beyond the control or power of the courts of the United States, unless they are repugnant to, or practically conflict with, some provision of the constitution of the United States, or of some law of congress passed in the exercise of the powers granted by the constitution of the Union. It is conceded, that, when there is such repugnancy or conflict, the laws of the United States, being of paramount authority, must necessarily prevail over the legislation of the states.

I shall, therefore, assume, that the legislature of New York has full power to pass an act authorizing the construction of a bride over the Hudson at Albany, and that no objection to the construction of such a bridge as the legislature of the state has authorized, can be urged, in this court, as the basis of an injunction to restrain such construction, unless the provisions of the act authorizing such construction are repugnant to the constitution or laws of the United States; or unless the bridge, if erected, would practically conflict with and abridge the rights to which the plaintiffs are entitled under the laws of the United States.

It will hardly be urged, that there is anything in the defendants' act of incorporation

to render it unconstitutional or otherwise objectionable, if the bridge authorized to be erected will in no manner obstruct the navigation of the river, and will not practically interfere with the rights of commerce and navigation acquired under the constitution and laws of the United States. This is substantially conceded by the plaintiffs, who allege that the bridge, when built, will be a material obstruction to navigation, and that any such obstruction is a violation of their rights under the laws of the United States.

The plaintiffs' rights under those laws, rest solely upon their coasting licenses. The precise terms of these licenses are prescribed by the act of congress which authorizes their issue, and the language of the license, so far as it relates to the character and scope of the privileges thereby granted, is very brief. It is by this language, and the general provisions of the act which authorizes the issue of these licenses, that we must determine the character and extent of the rights thereby conferred.

The granting words in the license are: "License is hereby granted for the said" (inserting here the description of the vessel) "called the" (inserting here the vessel's name) "to be employed in carrying on the coasting trade, for one year from the date hereof, and no longer." The privileges conferred by this license have not been otherwise defined or limited by act of congress, nor has their precise character or extent been determined by any judicial decision which has fallen under my observation. The privilege expressly given, is simply to be employed in the coasting trade. It was held, in Gibbons v. Ogden [supra] that the license gave to the licensed vessel a right to carry on the coasting trade from one state to the interior of another; and that a law of New York which assumed to make it unlawful for a vessel having such license to carry on the coasting trade between that state and New Jersey, without license, from Livingston and Fulton, under the laws of New York, if such vessel were propelled in whole or in part by steam, was repugnant to the provisions of the laws of the United States authorizing such coasting license, and, consequently, as it respected such licensed vessel engaged in inter-state commerce, unconstitutional and void. In that case, the respondents claimed under a law which assumed to give to certain parties and their grantees, the sole and exclusive right to navigate the waters of New York, in vessels propelled by steam—in other words to confer a monopoly of steam navigation; and it was very properly held that such law must yield to the paramount law of congress, with which it was in direct and practical conflict. In Gibbons v. Ogden there was no physical impediment interposed to the practical exercise of the right of trade and navigation conferred by the license issued under the authority of the United States, but the state had said, in direct terms, by its act of legislation, that the vessel of the appellant, which had the right to carry on the coasting trade from state to state, under its license issued in pursuance of the act of congress, should not navigate the waters of New York by steam power, without the additional license required by the state law. The state of New York had thus assumed to make a regulation of commerce—a regulation which affected only the instruments and operations of commerce—inconsistent with those made by the United States. In effect, the law of the United States declared that the vessel licensed might engage in and carry on the coasting trade between New York and New Jersey, and the law of the state declared that she should not; and, of course, the law of the state was held to be void, when thus directly and practically opposed to the law of the United States. The case of Gibbons v. Ogden, did not, however, decide, that the legislature of a state could not authorize a ferry or drawbridge over a navigable river within its own territory and jurisdiction. On the contrary, the language of Mr. Chief Justice Marshall, in delivering the opinion of the court, as already referred to, very clearly indicates that the states still have that power. And, I apprehend, no case in the supreme court of the United States can be found, sanctioning the claim of the plaintiffs in this suit.

But waiving, for the present, any examination of authorities, let us look for one moment to the act of congress which defines the character of the vessels which may become entitled to a coasting license. By reference to its provisions it will appear, that all vessels of twenty tons burthen and upwards, owned, &c., may be enrolled and licensed for the coasting trade, and that vessels of five tons and upwards and under twenty tons burthen, may be licensed for that trade without being enrolled. Act Feb. 18, 1793; 1 Stat. 305. The form of the license is substantially the same in each case, and there is nothing in the language or the policy of the act, to justify the conclusion that the vessel of six tons does not obtain the same privileges, in respect to trade and navigation, as one of a thousand tons. The act applies with as much force to waters where only the smaller craft can navigate, as to the deeper and broader and more important watercourses navigated by the other; and, if the states can close, or authorize physical obstructions or impediments to, the free navigation of the one, may they not, with equal right, do the same in respect to the other? If it be otherwise, who is to determine, in the absence of congressional legislation, how large the vessel must be, to bring it within the protection of its license, and to give it the power to override state legislation. In my judgment, there can be no difference, in this respect, in the privileges conferred by these licenses, whether

the vessels be large or small; nor do I find anything in the license, or in the act which authorizes its issue, to justify the conclusion, that congress, by the act referred to, intended to take away the right of the states to bridge their own rivers, whenever they thought proper to do so, in the exercise of their acknowledged powers of internal or domestic legislation. The very small size of the smallest vessels authorized to be licensed, the great number of vessels entitled to such licenses, and the great number and incalculable extent of the streams navigable by such craft, which would be withdrawn from state legislation by such a construction of the act, appear to me to furnish satisfactory evidence, that congress did not intend, by that act, (in which there is certainly no direct expression of such intention,) to give to the licenses issued in pursuance thereof, any such sweeping destructive effect, or to endow them with the capacity to produce, by their legitimate use, any such momentous consequences. Very many of our large cities are built, like Chicago and Cleveland, upon both sides of streams navigated by numerous vessels of larger or smaller dimensions. Bridges across these streams are of the first importance. not to say necessity, to the convenience and prosperity of the inhabitants of such cities, and even to the prosperity of the commerce between the states, and such bridges obstruct the navigation of the river across which they are thrown, much less than it would be obstructed by the ferries necessary to supply their place. If these streams cannot be even momentarily obstructed by a drawbridge, if every vessel having a coasting license has a right to run against and destroy such bridge, and if every owner of a vessel of six or more tons burthen, having such coasting license, has a right to come into the courts of the United States, and obtain an injunction to prevent the construction or use of such a bridge, or to obtain a decree that it shall be abated as a nuisance, those licenses will have a potency for evil, of which, for more than half a century after the passage of the act authorizing their issue, no one had the least suspicion; and consequences of vast moment, never contemplated by congress at the time of its passage, would flow from the act authorizing the issuing of such licenses.

But the case is not without authority on this point. The case of Wilson v. Black Bird Creek Marsh Co., 2 Pet. [27 U. S.] 245,·which was decided in 1829, after the decision in Gibbons v. Ogden, is, I think, quite decisive of this question. The legislature of Delaware had authorized the construction of a dam across a navigable creek passing through a deep level marsh, adjoining the Delaware river, up which creek the tide flowed some distance; and the defendants, being the owners of a sloop of more than 95 tons burthen, regularly enrolled and licensed for the coasting trade according to the laws

of the United States, broke and injured the dam erected under state authority, and were then sued for trespass and damage. Mr. Chief Justice Marshall, as in Gibbons v. Ogden, delivered the opinion of the court. He declared, that the dam authorized by the act of the legislature of Delaware stopped a navigable creek, and must be supposed to abridge the rights of those who had been accustomed to use it; but that such abridgment, unless it was in conflict with the constitution or a law of the United States, was an affair between the government of Delaware and its citizens, of which the supreme court of the United States would take no cognizance. He also declared, that congress had passed no act, in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows; that the power to regulate commerce had not been so exercised as to affect the question; and that the act authorizing the dam before referred to was not repugnant to the power to regulate commerce in its dormant state, or in conflict with any law passed on the subject. See U. S. v. New Bedford Bridge [Case No. 15,867]; Withers v. Buckley, 20 How. [61 U. S.] 84; Smith v. Maryland, 18 How. [59 U. S.] 71; Cooley v. Board of Port Wardens, 12 How. [53 U. S.] 299; and Passaic Bridge Cases, 3 Wall. [70 U. S.] 782, before Mr. Justice Grier.

The case of Pennsylvania v. Wheeling & Belmont Bridge Co., 13 How. [54 U. S.] 518, and 18 How. [59 U. S.] 421, remains to be considered. It was, probably, in consequence of the supposed ruling in that case, as explained and acted upon by Mr. Justice Grier in Devoe v. Penrose Ferry Bridge Co. [Case No. 3,845], that the counsel for the defendants, on the argument of the motion for a preliminary injunction in this case, made "no question as to the title, or, in other words, the legal right of the plaintiffs to a free and unobstructed navigation of the Hudson river," which, as was then understood by the presiding judge of this court, before whom such motion was made, "was not denied on the argument." See Mr. Justice Nelson's opinion, Silliman v. Hudson River Bridge Co. [Id. 12,851]. No such concession of the plaintiffs' right was made upon the final hearing; and, since the argument on the motion for the preliminary injunction, Mr. Justice Grier, in the Passaic Bridge Cases, has deliberately repudiated the interpretation of the Wheeling Bridge Case, on which he acted in Devoe v. Penrose Ferry Bridge Co. [supra].

The right claimed by the plaintiffs being denied, and the defendants' counsel having insisted that the Wheeling Bridge Case has no application to the case here presented, we have been called upon to examine that case, and to determine whether the decision made in it must control the case now before us. Although the chief justice and Mr. Jus-

tice Daniel dissented from the opinion of the court in the Wheeling Bridge Case, I have no inclination to resist it, because the decision was pronounced by a divided court. If I could satisfy myself that it was decisive of this case, I should unhesitatingly and cheerfully follow that decision. It would then be enough for me to say, "Ita lex scripta est," and to assent to a decree for the plaintiffs. I cannot now do so, for, after a careful and deliberate examination of the Wheeling Bridge Case, I am unable to perceive that it is necessarily decisive of the questions involved in the present controversy.

In that case, the plaintiff claimed no right under a coasting license, and, of course, the effect of such a license and of the law of the United States under which such licenses are granted, was not then a subject for judicial determination. The obstruction complained of, was a bridge across the Ohio at Wheeling, which, (though afterwards assented to and declared to be of lawful height and in conformity with the intent and meaning of its charter,) was not, when erected, of the character and height required by the act incorporating the bridge company, and was, therefore, at that time, unauthorized by congressional or state legislation. It was, however, subsequently sanctioned by the legislature of Virginia, and the power of the state legislature to authorize the bridge was, therefore, considered by the court. Mr. Justice McLean, in delivering the opinion of a majority of the court, (13 How. [54 U. S.] 557,) enters upon the discussion of the plaintiff's right to the free and unobstructed navigation of the Ohio river, by stating (page 561) that, "on the 18th of December, 1789, an act was passed by Virginia, consenting to the erection of the state of Kentucky out of its territory, on certain conditions, among which are the following: 'that the use and navigation of the river Ohio, so far as the territory of the proposed state, or the territory that shall remain within the limits of this commonwealth, lies thereon, shall be free and common to the citizens of the United States.' Rev. Code Va. 1819, p. 19. To this act the assent of congress was given. 1 Stat. 189." Afterwards, in answer to the objection that there was "no act of congress prohibiting obstructions in the Ohio river, and that, until there shall be such a regulation, a state, in the construction of bridges, has a right to exercise its own discretion on the subject," he says (page 565): "Congress have not declared, in terms, that a state, by the construction of bridges or otherwise, shall not obstruct the navigation of the Ohio, but they have regulated navigation upon it, as before remarked, by licensing vessels, establishing ports of entry, imposing duties upon masters and other officers of boats, and inflicting severe penalties for neglect of those duties, by which damage to life or property has resulted. And they have expressly sanctioned the compact made by Virginia with Kentucky at

the time of its admission into the Union, 'that the use and navigation of the river Ohio, so far as the territory of the proposed state, or the territory that shall remain within the limits of this commonwealth, lies thereon, shall be free and common to the citizens of the United States.' Now, an obstructed navigation cannot be said to be free. * * * This compact, by sanction of congress, has become a law of the Union. What further legislation can be desired for judicial action? In the case of Green v. Biddle, 8 Wheat. [21 U. S.] 1, this court held a law of the state of Kentucky, which was in violation of the compact between Virginia and Kentucky, was void; and they say this court has authority to declare a state law unconstitutional, upon the ground of its impairing the obligation of a compact between different states of the Union. * * * No state law can hinder or obstruct the free use of a license granted under an act of congress. Nor can any state violate the compact, sanctioned as it has been, by obstructing the navigation of the river. More than this is not necessary to give a civil remedy for an injury done by an obstruction." In view of this language, and of the fact that Pennsylvania claimed under no license, and had no interest in vessels navigating under licenses granted by the authority of the United States, but prosecuted her suit on the ground that the state, as owner of lines of canals and railways, had a deep interest in keeping the navigation of the Ohio open, and free, and unobstructed, according to the terms of the compact sanctioned by congress, I think it proper to assume, (especially as the court did not profess to repudiate the doctrines in regard to domestic or state legislation put forth by Mr. Chief Justice Marshall in Gibbons v. Ogden, or to overrule the case of Wilson v. Black Bird Creek Marsh Co. [supra]), that it was upon the ground of this compact and its congressional sanction, that the decision of the Wheeling Bridge Case was made; and that the reference to the other legislation of congress, in respect to the navigation of that river, was not to show the direct and immediate ground upon which that case proceeded, but was rather intended to show, that congress had continued to act upon the assumption, that such compact was binding upon the states, and that the rights thereby secured "to the citizens of the United States" were insisted upon by congress, and had been in some sense made the subject of congressional regulation. I admit that there is much in the opinion of Mr. Justice McLean to favor the conclusions which the counsel for the plaintiffs seek to draw from the decision in that case, but it is well known that the opinions of that learned judge in regard to the power to regulate commerce, are not always in consonance with those of a majority of the court; and, to adopt the conclusions in respect to the Wheeling Bridge Case urged upon us by the counsel for the plaintiffs, would require us to act upon principles

of constitutional law which would subvert the just and proper authority of the state governments, and which I shall not willingly adopt until they have the unequivocal and unmistakable sanction of the supreme court of the United States.

In the examination of these cases, the question has naturally occurred, whether the very great change in the relative importance of natural and artificial channels of commerce and communication, caused by the progress of civilization and the arts, has changed or at all affected the rights of navigation which were established when commerce between different states, and between different portions of the same state, was, from necessity, almost entirely carried on by means of ships and vessels which traversed the naturally navigable waters of the country. Not only the course of trade and commerce, the interests of travel and traffic, but also the best interest of all classes, then required that a free and unobstructed use and navigation of the navigable watercourses of the country should be maintained. But the introduction of canals and railroads has so changed the lines and modes of transportation and the course and character of trade, that the commerce which passes up and down a river is, in many cases, quite unimportant and scarcely worthy of a moment's consideration, in comparison with the trade and commerce and travel which cross it, on the lines of canal and railroad transportation running nearly at right angles with its course. In such cases, a wise and just policy would seem to require, that the unimportant and trivial interest of river navigation should be required to submit to such slight abridgment of its ancient rights as may be reasonably required for the proper development of the superior advantages of the more modern, more useful, and more important modes of transportation by railroad or canal. In other cases, the known importance of the two conflicting interests may be nearly equal, or their relative importance, present and prospective, quite uncertain; and it would, therefore, seem to be necessary that some department of government should have the power to decide between these conflicting interests, to give preference to the one one or the other, or to provide for the simultaneous exercise of rights which the public interest might require to be accorded to each. I do not doubt that such a power exists, but, in my judgment, it is a legislative and not a judicial power. The courts cannot make or change the law applicable to either of these cases. They can only administer the existing law, and they must leave to the legislature the duty of modifying it, as the changes in the condition and course of the business of the country and the ever varying interests of trade, commerce and navigation may require. And this naturally brings us to the consideration of the question of the authority, exclusive or concurrent, paramount or subordinate, absolute or relative, which can properly be exercised over this subject by the state and national legislatures, and how these powers may be harmoniously exercised, the national and state governments being respectively confined to their appropriate spheres of action.

I cannot doubt that the legislature of a state may, in the absence of any restraint by congressional legislation, authorize the erection of a bridge over its navigable waters; and, as the Hudson at Albany, and as far above as tide water extends, is extensively used in carrying on foreign and inter-state commerce, I do not doubt that congress has, and, whenever the public interests shall require it, may properly exercise, the power to prohibit the erection of any bridge across the river at Albany, or to prescribe what draws and other facilities for passing shall be required, in case it chooses to prohibit the erection of any bridge which shall not give to the interests of navigation such privileges and facilities in passing it as may be prescribed by congress. When congress has legislated, this court can act upon such legislation; but, in the absence of congressional legislation, the law of the state must furnish the rule for our decisions, precisely as though we were sitting in a state court.

The state legislature, until the national legislature shall, either directly or indirectly, otherwise determine or provide, may authorize a bridge upon such terms and of such mode of construction as it may deem just and expedient; and I can discover no solid ground upon which a court of the United States can proceed to overturn such state legislation. The courts of the United States can exercise no authority in such cases, until it has been given by congress, by the passage of an act within its constitutional powers, and which necessarily restrains, or practically conflicts with, the legislation of the state.

In most cases of this kind, the action of congress must necessarily be restrictive or prohibitory; or in the nature of a regulation declaring the terms upon which, only, a bridge may be built. This results from the character of the question, and the nature of the powers over the subject, which are possessed by the national and state legislatures respectively. Congress has power to regulate commerce with foreign nations and among the states, and has, therefore, the power to say that the navigation of the Hudson, which is essential to the prosperity of that commerce, shall not be obstructed by a bridge; but it has no power to construct, or to authorize individuals to construct, a bridge across the Hudson at Albany, unless such bridge is required for some purpose national in its character, so as to bring the case within the delegated powers of the national legislature. The power to authorize a bridge, in the absence of congressional restraint, is, therefore, with the state, and is to be exercised by the state legislature, which can most properly and judiciously exercise the power of abridging the common law right of navigation, and of de-

termining what measures shall be adopted by the proprietors of a bridge, in order to secure, as far as practicable, a substantial enjoyment of the rights of navigation, and at the same time give to the public the substantial and beneficial enjoyment of the advantages to be attained by the construction of the bridge. These rights are not so far incompatible, that they may not, under proper arrangements, be simultaneously exercised, without any very material abridgment of either; and, to devise and provide such arrangements, is the appropriate business of the legislature, while it is not within the legitimate province of the judicial department of the state or of the national government.

If the state legislature assume to authorize what congress, in the legitimate exercise of its delegated powers, has prohibited, the courts of the United States may declare the state legislation which contravenes that of the nation to be void, and that the proper authority of the United States shall be upheld; but, until the legislation of the state conflicts with that of congress, or with the constitution of the United States, this court has no authority to annul the legislation of the state, by the restraining process of injunction.

The bills of complaint in these causes should be dismissed, with costs.

The judges being thus opposed in opinion, a division of opinion was certified to the supreme court, in October, 1859. The points so certified are set forth in the report of the case in that court, in 1 Black [66 U. S.] 582. On those points the judges of that court were equally divided. This court then made decrees dismissing the bills. [Case No. 2,983.] From those decrees the plaintiffs appealed to the supreme court, and, on the hearing of those appeals, the judges of that court being equally divided [Albany Bridge Case] 2 Wall. [69 U. S.] 403, the decrees of this court were affirmed.